## NATIONAL SURETY CO. v. STATE TRUST & SAVINGS BANK. (No. 10330.)

Court of Civil Appeals of Texas. Dallas. April 1, 1929. Dissenting Opinion, April 19, 1929.

Bell & Clark, of Dallas, for appellant.
Webster Atwell, of Dallas, for appellee.

VAUGHAN, J. Appellant issued its surety bond to the city of Dallas to protect said city against forgery on its checks and warrants. Said bond was executed on the 15th day of February, 1924, indemnifying said city against loss through the payment by its depository bank of any check or draft drawn by said city against such bank upon which the name of the payee or any other person, firm, or corporation, as indorser thereof, shall have been forged. Appellant's cause of action rests upon it being subrogated to the rights and remedies of the city of Dallas. Therefore appellant stands in the same relation to this suit as the city of Dallas would if the plaintiff. As to the pleadings of the parties, it is only necessary to state that same were sufficient to present the issues upon which the case was tried in the court below and are reflected in the propositions upon which this appeal is predicated, and counter propositions. Judgment was rendered in favor of appellee upon an instructed verdict.

Following are the material facts we find to have been established: That prior to and during the transactions out of which arose this litigation, the city of Dallas had in its employment one A. M. Lyles as superintendent of maintenance in its sanitary sewer department, his duties being to look after the labor and report all broken and bad sewer lines and stopped sewers; that the number of employees under him varied from six to thirty; that for said department he was authorized to hire and discharge laborers; that he was required to and did make out daily time sheets containing the names of the employees of said city working under him and the amount of money each was entitled to; that said time sheets were delivered at the close of each day to the assistant engineer of said city at his office; that same were filed away until the end of the week, when the pay rolls would be made up from said time sheets; that it was no part of said Lyles' duty to make out the pay rolls for the workmen in said department, and he did not do so; that the pay rolls so made up were forwarded to the city auditor, and in turn by said auditor sub-

mitted to the water commissioner, who had supervision of the department for which said pay rolls were made out, and when approved by said commissioner the warrants were issued thereon and delivered to the foremen of the respective departments to be delivered by them to the employees for whom issued; that on different dates between July 24, 1925, and April 23, 1926, said A. M. Lyles placed upon the time sheets prepared and delivered by him to the proper official of said city the fictitious names of A. O. Roberts and M. Hall, and that in conformity with said time sheets the names of said Roberts and Hall and the amount of money each was shown thereby to be entitled to were included in the pay rolls made up therefrom; that said pay rolls were in the regular way approved by the chief office clerk of said sanitary department by the water commissioner and by the city auditor, and warrants were drawn payable to said Roberts and Hall as the actual employees of said city by its auditor on the treasurer of said city; that all of the parties dealing with said pay rolls and issuing said warrants were in the service of the city of Dallas; that the city treasurer by contract was one Percy Davis and by appointment an officer of said city on salary; that said warrants were drawn in the regular way and routine of business by the proper officers of the city, all of whom believed the said A. O. Roberts and M. Hall to be real persons working in said department and to receive the amounts shown in the respective pay rolls as prepared from time to time upon said false time sheets showing said Roberts and Hall to be in the service of the city and entitled to the respective sums of money as reported in said pay rolls; that A. M. Lyles represented the assistant auditor of said city, whose duty it was to deliver said warrants, that said A. O. Roberts and M. Hall worked on small jobs in isolated locations not more than fifteen or twenty minutes at a time, making personal delivery to them of said warrants very uncertain and inconvenient; that under these conditions the warrants in question were delivered to said Lyles, to be by him delivered to said Roberts and Hall; that, after said warrants had been delivered to said Lyles, he then forged the indorsement of the fictitious employees, Roberts and Hall, upon the back of the warrants issued to them respectively, took said warrants to the defendant bank, where he was well and personally known and maintained an account, indorsed said warrants with his own name, and by reason of such indorsements obtained the respective amounts of said warrants for his own use and benefit; that the defendant bank, then being the owner and holder of said warrants, presented same to the city treasurer of the city of Dallas, with whom said city maintained its account, out of which warrants drawn by it were paid; that the city treasurer, relying solely upon the indorse-

ment of the defendant bank, which was the last indorsement shown on said warrants, and believing that all indorsements thereon were genuine and had been made by the proper parties, and that said employees were actually existing persons in the employ of the city of Dallas, and entitled to receive said amounts, and that said warrants were worth the amounts shown thereon, cashed them and surrendered the respective amounts for which said warrants were issued to defendant bank, which still retains the same; that, except for said indorsements and the belief above stated, said city treasurer would not have paid the defendant bank the respective amounts of said warrants totaling the sum of $1,020.80; that defendant collected from said city the respective sums called for by said warrants as each was acquired by it in due course of banking; that during the period of time from July 1, 1925, to April 1, 1926, inclusive, the city had probably about 1,300 employees; that no one of the officers or employees representing the city in the preparation of the pay rolls or drawing of the warrants involved in this suit knew said Lyles by any other name than that of A. M. Lyles, and never heard of him going under or assuming in any respect the name of M. Hall or A. O. Roberts, or knew that he had said warrants so issued in the name of A. O. Roberts and M. Hall for the purpose of collecting the money thereon for his own personal use and benefit; that appellee, on account of the indorsement of the payees therein placed thereon by said Lyles, the indorsement of Lyles, and because he had an account with appellee, cashed each of said warrants, paying the amount thereof to said Lyles without making an investigation to ascertain whether or not the payees in the warrants had in fact indorsed same or to ascertain whether or not said Lyles was a holder of said warrants in due course; that said Lyles was convicted and sentenced to the penitentiary for forging the indorsement of the fictitious employees, Roberts and Hall, on said warrants. Appellant, on demand of said city, viz., November 30, 1926, paid the sum of $1,020.80, under its said surety bond, and obtained from the city of Dallas and Percy Davis, its treasurer, proper assignments by which it succeeded to all of the rights, titles, and causes of action held by said city and Davis and against defendant. No evidence was offered to prove that Lyles' offer to refund to the city of Dallas the amount of $1,020.80, obtained by him through the forged indorsements of said warrants, was accompanied by the tender of said sum in cash, or its equivalent.

Following are appellant's propositions in support of its appeal:

■ "No. 1: Defendant, State Trust & Savings Bank, by endorsing and delivering said warrants and obtaining the cash from Percy Davis while it was the owner of said warrants, guaranteed the genuineness of all pre-

vious endorsements including that of A. C. Roberts and M. Hall, and by the acceptance of said money guaranteed that they were valuable to the extent of the respective amounts thereof.

■ "No. 2: The said Percy Davis having surrendered the amounts of said warrants to defendant under the belief that they were worth the amounts therein shown, that all the endorsements were genuine, that the payees were existing. persons in the employ of the City of Dallas and entitled to receive said money, paid same under mistake of fact, and the defendant having thus received said money is bound to return the same.

■ "No. 3: The defendant, State Trust & Savings Bank, who knew the impostor and cashed the warrants upon his purported honesty without inquiry or investigation as to the endorsements appearing thereon when, they had ample opportunity to do so, was guilty of negligence by 'virtue of which the ultimate loser is entitled to recover.

"No. 4: Percy Davis, as City Treasurer, occupies the same position and possesses the same rights as any other depositing bank, and such rights having been assigned to appellant it is entitled to recover the amount sued for.

"No. 5: Even though the said A. M. Lyles had been known under the assumed name of A. C. Roberts and M. Hall, which is wholly contrary to the evidence, the endorsement of a name other than his own for the purpose of obtaining money would nevertheless be forgery and would in no way excuse the negligence of defendant who knew him by the name of A. M. Lyles and no other, in paying the money to him.

■ "No. 6: The evidence definitely showing that defendant took the warrants from A. M. Lyles because he was known at the bank and had his account there, the negligence alleged by defendant on the part of the city could have no bearing on the case, as it in no way contributed to or induced the act of the defendant bank in paying said money to A. M. Lyles or in obtaining re-imbursement from Percy Davis.

■ "No. 7: The proposition of imputed knowledge of fictitious payees to the City of Dallas through Lyles as its agent, mentioned in defendant's answer cannot be sustained because it was not alleged, and could not have been proven that the act and knowledge of Lyles with reference thereto was within the scope of such agency if any existed."

By the following counter propositions appellee contends that said judgment was properly entered· and should not be disturbed:

"No. 1: The undisputed evidence being that A. M. Lyles, as foreman of the sanitary sewerage department of the City of Dallas, placed on the payroll of his department the names of A. C. Roberts and M. Hall, thereby padding the same with the intention of using the vouchers issued in said names as his own, and assuming for such purpose the name of A. C. Roberts and the name of M. Hall, the said Lyle's endorsement of the vouchers in the name of A. C. Roberts and in the name of M. Hall, were not forged endorsements, and, accordingly, said vouchers were good, valid and subsisting obligations, and the guarantees of the defendant bank by virtue of its endorsement upon the same, were fulfilled; and the payment of said vouchers by the City Treasurer, was not under mistake of fact.·

"No. 2: This being a suit by the National Surety Company, the appellant, on a right of subrogation by virtue of an alleged loss that said company incurred under a bond which it had written for the City of Dallas, protecting the said City against forgery, and there having been no forgery under the undisputed evidence of any endorsement on any city vouchers, the National Surety Company stands in no better shoes than does the City of Dallas, and there was no caused loss on the part of the National Surety Company.

"No. 3: Because the vouchers for which recovery is sought were issued one each week for a period of nine months by the City of Dallas, through its own channels, and were so issued at the instance of its own employees, and because there was no legally constituted office of paymaster of the City of Dallas through whom these checks would be distributed to the payees thereof, the City of Dallas, and the National Surety Company, which stands in the same shoes as the City of Dallas, was negligent and cannot now be heard to complain of the defendant bank cashing these vouchers so issued, which appear regular in every way, and of which vouchers, the defendant bank was a bona fide purchaser."

Applying the rules of law announced by the following decisions and statutory provisions to the above facts, we are of the opinion that appellant's propositions should be sustained and appellee's overruled. City Bank of Houston v. First Nat. Bank of Houston, 45 Tex. 203; First Nat. Bank of Quitman v. Wood County et al. (Tex. Civ. App.) 294 S. W. 324; First Nat. Bank of Winnsboro v. First Nat. Bank of Quitman (Tex. Com. App.) 299 S. W. 856; Farmers' Nat. Bank of Augusta v. Farmers' & Traders' Bank of Maysville, 159 Ky. 141, 166 S. W. 986, L. R. A. 1915A, 77; State v. Merchants' Nat. Bank of St. Paul, 145 Minn. 322, 177 N. W. 135; Wells Fargo & Co. v. Simpson Nat. Bank, 19 Tex. Civ. App. 636, 47 S. W. 1024; Miller v. Stewart (Tex. Civ. App.) 214 S. W. 565; United States v. Nat. Exchange Bank, 214 U. S. 302, 29 S. Ct. 665, 53 L. Ed. 1006, 16 Ann. Cas. 1184; State v. Broadway. Nat. Bank, 153 Tenn. 113, 282 S. W. 194; Shipman v. Bank of State of New York, 126 N. Y. 318, 27 N. E. 371, 12 L. R. A. 791, 22 Am. St. Rep. 821; Guaranty State Bank & Trust Co. v. Lively,

108 Tex. 393, 194 S. W. 937, L. R. A. 1917E, 673; articles 979, 986, 988, 989, 990, 992 and 1003, Texas Penal Code 1925.

We therefore hold that the instructed verdict and judgment rendered thereon in favor of appellee was not authorized, but, to the contrary, verdict should have been instructed in favor of appellant and judgment rendered thereon accordingly.

It is therefore ordered that the judgment of the trial court be, and the same is hereby, reversed, and judgment is here rendered in favor of appellant for the amount of $1,020.-80, with interest thereon from the 30th day of November, 1926, at the rate of 6 per cent. per annum, together with all costs incurred in the court below and this court.

Reversed and rendered in favor of appellant.

LOONEY, J. (dissenting). I am unable to agree to the disposition of the case made by the majority, for the reasons which I will now state.

The majority opinion gives a full statement of the case, the material facts involved, the propositions urged by appellant for reversal, and counter propositions urged by appellee in support of the judgment, but the rules of law that controlled in reaching the decision are not stated otherwise than by reference to cases cited and provisions of the Penal Code, relating to the crime of forgery.

On examination it appears that the authorities cited support, among others, these propositions: That an indorsement of commercial paper is a contract with all subsequent holders, to the effect that the instrument itself and antecedent signatures thereon are genuine, and further that money paid upon a mistake of fact may be recovered. In view of the facts with which we are dealing, I assume the majority were controlled by one or both of these rules. While each authority cited is related in a generic sense to the case at bar, still there is such a differentiation in the facts involved that it cannot, in my opinion, be correctly said either is directly in point.

Appellant's cause of action is based on the idea that it was subrogated to the rights of the city of Dallas, and stands precisely in its shoes; it follows, therefore, that, if the city had no cause of action for the recovery of money paid by the bank on the warrants issued to fictitious and nonexisting persons, appellant had none, and was properly denied recovery. It is not denied that appellee paid full value for the warrants and at the time was innocent of any knowledge of the forgeries and fraud involved in their origin and negotiation.

The rule is well settled at common law that, where commercial paper is drawn and put in circulation, payable to a fictitious person, the holder can declare and recover, as on a bill or note payable to bearer, its le-gal effect (ignoring its form) being that of an instrument payable to bearer, and this is true whether the maker or drawer knew or did not know the payee was a fictitious person. 1 Daniel on Negotiable Instruments (6th Ed.) § 139, states the rule as follows: "In a case of a note payable to a fictitious person, it appears to be well settled that any bona fide holder may recover on it against the maker as upon a note payable to bearer. It will be no defense against such bona fide holder for the maker to set up that he did not know the payee to be fictitious. By making it payable to such person he avers his existence and he is estopped, as against a holder ignorant of the contrary to assert the fiction * * *. where a note has as its payee a fictitious firm, and the holder endorses it, assuming the firm's name, a bona fide endorsee may recover against the maker. * * *" Also see Coggill v. American Exchange Bank, 1 N. Y. 113, 49 Am. Dec. 310, 313.

The common-law rule, however, has been modified in this state by statute to the effect that an instrument is construed as payable to bearer "when it is payable to the order of a fictitious or non-existing person, and such fact was known to the person making it so payable." See Neg. Ins. Act, art. 5932, R. S. 1925, § 9, subd. 3. The pertinent question therefore is, Did the city of Dallas, legally speaking, have notice at the time the warrants were drawn of the fictitious and nonexisting character of the payees to whose order the fraudulent warrants were drawn? If so, appellee bank, as bearer of the warrants, held an unimpeachable title, and was in no way liable to the city; therefore was not liable to appellant for money collected thereon. What are the facts? Lyles, the impostor, was superintendent of maintenance in the sanitary sewer department of the city government, was given power to employ and discharge laborers—therefore was a general agent, was required to and did make out and file with the engineering department daily time sheets containing the names of employees under him and the amount of money due each; from these daily time sheets the engineer, at the end of the week, made out a pay roll that was transmitted to the auditor of the city, who, in turn, presented same for approval to the commissioner having charge of that department of the city government, and, after being approved by the latter official, the auditor drew warrants payable to the order of the respective laborers, these after being signed by the mayor, countersigned by the auditor, attested by the secretary, were turned over to Lyles for delivery to the laborers. Taking advantage of the authority and confidence reposed in him, Lyles hatched his swindling scheme; that is, beginning in July, 1925, and continuing until April 23, 1926, he padded his daily time sheets with the names of two ostensible, but non-exist-

ing, laborers, and, in pursuance of the system in vogue, the engineer made up pay rolls, and, after being approved by the commissioner, warrants were issued thereon and given to Lyles for delivery to the fictitious payees. In furtherance of the swindle, Lyles indorsed the names of the fictitious payees on the warrants, as well as that of his own, and were by him presented to, and cashed by, appellee bank, and later the bank presented same to and received payment from the city. These are the material facts bearing on the point under consideration. Were these facts sufficient to visit notice on the city of the fictitious character of the payees to whom it made the warrants payable? I think so. It is axiomatic that acts performed and knowledge obtained by an agent, within the scope of his authority, are the acts and knowledge of his principal, even though the agent may act fraudulently to serve his personal ends.

In Gleason v. Seaboard, etc., R. Co., 278 U. S. 349, 49 S. Ct. 161, 73 L. Ed. ——, where a railroad employee, having a duty to give notice to those engaged in the cotton trade of the arrival of cotton "under order notify" bill of lading, forged a bill of lading and notified the consignee of its arrival, whereupon the draft attached to the bill was paid, the railroad was held liable. notwithstanding the fact that the false statements were made solely to effect a fraud for the employee's benefit. Also see Litchfield Shuttle Co. v. Cumberland, etc., Bank, 134 Tenn. 379, 183 S. W. 1006; Bartlett v. First Nat. Bank, 247 Ill. 490, 93 N. E. 337, 340.

A case directly in point is Equitable Life Assur. Soc. v. Nat. Bank of Commerce (Mo. App.) 181 S. W. 1176. An agent of the insurance society, with authority to solicit and take applications for life insurance, and to forward proofs of death, to whom drafts in settlement of death claims were forwarded by the society for delivery to beneficiaries formed a conspiracy with others to defraud the society, and, in furtherance of the enterprise, procured the execution of an application for insurance on the life of Samuel T. Wicker, a nonexisting person, payable to his wife, Mary J. Wicker, also a nonexisting person, a policy was issued accordingly, and afterwards he assisted in procuring proofs of death of the fictitious insured, forwarded same to the society, thereupon a draft was issued payable to the order of the named beneficiary in settlement of the death claim, was forwarded to this agent for delivery, and, after the name of the fictitious beneficiary was indorsed thereon, the recreant agent put same in circulation, which, after a limited circulation, finally reached defendant bank, with whom the society kept an account, was paid by it, and the amount charged against the account of the society. After

discovering the swindle, the society sought to recover from the bank the money paid, on the ground that the indorsement of the fictitious beneficiary on the draft was a forgery. The society was denied recovery, and in disposing of the case the court, among other things, said : "By his act [the agent] he put this check into circulation. The check was sent to him by the appellant for delivery to Mary J. Wicker [the fictitious beneficiary]. He knew that was a non-existing fictitious person. His knowledge of that fact must be held to be the knowledge of his principal, the appellant. So that the appellant had notice and knowledge, through its agent Davies, that the check named as payee a fictitious, non-existing person. By the act of delivering such a check and so putting it in circulation, the bank upon which it was drawn is entitled to the same protection as if the check had been payable to bearer. This appellant, a corporation, can act only through agents. When those agents, acting within the apparent or real scope of their authority, commit a tort, the principal is bound for the consequences. Garretzen v. Duenckel, 50 Mo. 104, 11 Am. Rep. 405, so holds and the doctrine there so clearly announced by Judge Wagner has never been departed from in our State. This corporation, appellant, had as much knowledge of the fictitious character of this payee, through the knowledge of its agent Davies, when he delivered the check and put it in circulation as if another agent, its treasurer, for instance, had, with that same knowledge, issued this check."

Again at page 1182 the court used this language: "But in the case before us, we hold that the knowledge of this agent Davies of the fictitious character of the payee in this check, was the knowledge of the drawer of the check, the appellant here, and that, under the common law, however construed, it cannot recover from respondent, an innocent holder for value, and here the payor."

I think the court announced a sound doctrine, that it is applicable to the facts of this case—hence I am of opinion that the city of Dallas was visited with the knowledge possessed by Lyles, that is, that payees in the fraudulent warrants were fictitious persons, therefore the instruments were in legal effect payable to bearer, and, as appellee bank was an innocent holder for value, was entitled to protection as such. So, for this reason, I think the judgment of the court below was correct, and should have been affirmed.

Furthermore, I believe the judgment should have been affirmed, under the equitable principle that, "where one of two innocent parties must suffer, he through whose agency the loss occurred must bear it."

In Day v. Brenton, 102 Iowa, 482, 489, 71

N. W. 538, 540 (63 Am. St. Rep. 460) the Supreme Court of Iowa stated the doctrine as follows: " 'Where one of two innocent parties must suffer, he through whose agency the loss occurred must bear it.' Again: 'Where somebody must be a loser by reason of a deceit practiced, he who employs and puts trust and confidence in the deceiver should be the loser, rather than a stranger.' Again, it has been said: 'Where loss is caused by the fraud of a third person, such loss should fall on the one whose act enabled such fraud to be committed.' " Also see Union Pac. R. Co. v. Johnson, 45 Neb. 57, 63 N. W. 144, 147, 50 Am. St. Rep. 540; 10 R. C. L. 378, § 128.

As heretofore shown, Lyles, the city's superintendent of maintenance in its sanitary sewer department, systematically padded his daily time sheets by reporting A. C. Roberts and M. Hall, fictitious persons, as having performed labor, from these daily time sheets, the engineer made up weekly pay rolls that ultimated in the issuance of the fraudulent warrants which were intrusted by the city to Lyles for delivery to creatures of his imagination, thus making it possible for him to consummate this swindle.

The case should not, in my opinion, be determined by rules of commercial law that control in cases of forged indorsements, for forgery was only one act in the scheme, and should be considered only in its relation to other acts making up the whole; that is, as a part of the ensemble. The general authority conferred on Lyles by the city, the generous confidence reposed in him, made the swindle possible, without which he could not have succeeded. The city employed no method of checking the accuracy of daily time sheets filed by him, which, if done, evidently the swindle could have been prevented, on the contrary, he was given such a free hand that he was enabled to easily and successfully consummate the swindle.

That the city was at fault the undisputed evidence shows, for it was by reason of the power and confidence reposed by it in Lyles, its failure to check or otherwise verify the accuracy of his daily time sheets, that enabled him to successfully prosecute the swindle. This agency that the city permitted him to exercise without proper supervision was itself a dangerous instrumentality, calculated to cause precisely what it did cause, that is, an injury to be suffered by another, and, as this resulted from the agency created by the city, it should shoulder the consequences of its employee's bad faith.

Appellant should not be permitted to successfully contend that the bank failed to protect the city from fraudulent devices of its trusted employee who, under circumstances created by it, had so easily deceived it, for, if such contention prevails, the bank, an innocent party, will be made to suffer a loss resulting from the city's own derelictions.

The authorities cited below support, in principle, the proposition for which I am now contending, to wit: Heavy v. Commercial Nat. Bank, 27 Utah, 222, 75 P. 727, 101 Am. St. Rep. 966; United States v. Nat. Exchange Bank (C. C.) 45 F. 163; Iron City Nat. Bank v. Fort Pitt Nat. Bank, 159 Pa. 46, 28 A. 197, 23 L. R. A. 615; Phillips v. Mercantile, etc., Bank, 140 N. Y. 556, 35 N. E. 982, 23 L. R. A. 584, 37 Am. St. Rep. 596; 3 R. C. L. 999, § 209.

It is insisted, however, that the bank was at fault in cashing the warrants without making proper investigation to ascertain whether or not Lyles was a holder in due course. If it be conceded that, under the circumstances, the bank should have made such investigation, yet a vain or an unreasonable thing would not be required. If the bank had questioned Lyles when the warrants were presented, is it reasonable to suppose he would have disclosed his criminal scheme? I submit not. If the bank had gone further and inquired of the city engineer, who made up the weekly pay rolls, of the commissioner, who approved the pay rolls for warrants, of the auditor who drew and countersigned the warrants, of the mayor who executed same, or of the secretary who gave his attestation, is it reasonable to assume, in view of their positive official affirmance of the validity of these transactions, that they could or would have disclosed any impeaching evidence? I do not think it reasonable to assume that any such evidence would have been disclosed. Certainly the bank would not have been required to pursue the investigation any further, and, if pursued even thus far, the quest would have proven futile, because the case had been so circumstanced by what the city had done and failed to do that an investigation would have disclosed nothing.

For this additional reason, I am of opinion the judgment of the trial court was correct, and should have been affirmed.